**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VALERIE CHAMBERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:14cv1900 PLC** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Valerie Chambers ("Plaintiff") seeks review of the decision by the Social Security Commissioner, Carolyn Colvin ("Defendant"), denying her application for a period of disability and disability insurance benefits under the Social Security Act ("Act"). The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8). Because the court finds that the decision denying benefits was not supported by substantial evidence, the court reverses the Commissioner's denial of Plaintiff's application and remands the case for further proceedings.

### I.    *Procedural History*

In November 2011, Plaintiff filed an application for a period of disability, Disability Insurance Benefits, and Supplemental Security Income Benefits claiming that she became disabled on August 31, 2011.[1]  (Tr. 174-86). The Social Security Administration ("SSA") denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 108-09). The SSA granted Plaintiff's request for review and conducted a hearing

---

[1] Claimant later amended her alleged onset date to October 1, 2011. (Tr. 12).

on May 30, 2013.  (Tr. 28-83, 134-49).  In a decision dated June 28, 2013, the ALJ found that Plaintiff had "not been under a disability, as defined in the Social Security Act, from October 1, 2011[] through the date of this decision."  (Tr. 12-21).  Plaintiff sought review of the ALJ's decision, and the SSA Appeals Council denied her request on September 23, 2013.  (Tr. 1-8). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as Defendant's final decision.  See 20 C.F.R. § 404.981.

## II.    Evidence Before the ALJ

### A.  ALJ hearing

Plaintiff, who was thirty-six years of age, appeared with her counsel at the administrative hearing in May 2013.  (Tr. 30).  Dr. Charles Auvenshine and Brenda Young, a vocational expert, were also present.  (Tr. 31).  The ALJ began by examining, Dr. Auvenshine, who testified as a non-examining medical expert.  (Tr. 32-33).  Based on his review of Plaintiff's records, Dr. Auvenshine concluded that Plaintiff suffered four categories of impairments:  organic disorders, effective disorders, anxiety-related disorders, and personality disorders.  (Tr. 33).  Dr. Auvenshine stated that "[o]ther disorders that were referenced . . . but really not documented" included:  borderline intellectual functioning, ADHD, oppositional defiant disorder, and intermittent explosive disorder.  (Tr. 34).  According to Dr. Auvenshine, "no one of these [impairments] or any combination of these [impairments] rises to the level that meets or equals" the criteria of a listed impairment.  (Tr. 35).

Plaintiff's attorney challenged Dr. Auvenshine's testimony that he "found no instances of decompensation in the record."  (Tr. 35).  When Plaintiff's attorney questioned why Dr. Auvenshine did not consider Plaintiff's June 2012 admission "to the inpatient unit for suicidal precautions" an episode of decompensation, Dr. Auvenshine, responded:

> Usually I think of decompensation as being a psychotic break or loss of contact
> with reality noted.  It may be but I guess I didn't – I didn't perceive it that way
> as I read through it.  And that – that is a very large file and there are some
> strong points to be made to that effect so your – your point is well taken.

Plaintiff's attorney also asked Dr. Auvenshine whether he considered a Mental Medical Source

Statement ("MMSS") completed by Dr. Marie Gebara, Plaintiff's treating psychiatrist.  (Tr. 36).

In the MMSS, Dr. Gebara assessed Plaintiff with three extreme limitations in activities of daily

living, one extreme limitation in social functioning, and "multiple extremes" in concentration,

persistence or pace.  (Id.).  Dr. Auvenshine did not answer directly but stated that he considered a

MMSS completed by Dr. Meredith Throop, Plaintiff's previous psychiatrist, which "is the same

or comparable" to Dr. Gebara's statement.  Upon further questioning, Dr. Auvenshine conceded

that Drs. Gebara and Throop "make the strong case and if we had only that record to go on I

would say that our claimant would meet the listing."  (Id.).  Dr. Auvenshine also testified that he

did not include in his assessment treatment notes from Jewish Family and Children Services

because he could not read the signature on the reports.  (Tr. 37).

In regard to Plaintiff's intellectual ability, Plaintiff's attorney asked Dr. Auvenshine

"which of the various intellectual assessments of this claimant would be the most reliable in

terms of her current level of functioning?"  (Tr. 38).  Dr. Auvenshine explained that he was

"inclined to take the highest values" obtained on Plaintiff's three IQ tests, but he believed "we

have a pretty good idea that she's in the borderline to low average range for intellectual

functioning."  (Tr. 39).  When Plaintiff's attorney asked Dr. Auvenshine whether, when he

described her levels of functioning "in terms of the mild and moderates," he considered the fact

that she received "different kinds of job coaches and assistance from vocational rehabilitation

when maintaining her part-time work both at Fed-Ex and Arby's," Dr. Auvenshine responded, "I

don't think I made any assumptions about it."  (Tr. 40).

Plaintiff testified that she was thirty-six years old, lived with her boyfriend, and used public transportation. (Tr. 41-42). Plaintiff stated that she completed high school, where she received some special education services, and earned a certificate of participation. (Tr. 44, 68). Plaintiff claimed she also received some college education, but she did not complete a degree and could not remember what college she attended. (Tr. 44).

Plaintiff testified that her most recent employment was as a package handler for FedEx, where she worked "three or four years." (Tr. 45). Plaintiff "did okay" in that job, but she received "a number of write ups . . . because I wasn't – I wasn't fast enough . . . ." (Tr. 45-46). Due to the write-ups and slow speed, Plaintiff switched from unloading trucks to barcode labeling, which reduced her hours. (Tr. 71-72). Plaintiff earned $13 per hour and lifted packages as heavy as 50 pounds. (Tr. 46). Her last day of employment at FedEx was June 29, 2012. (Tr. 46).

Prior to working for FedEx, Plaintiff worked as a fry cook at Arby's for approximately one and a half years. (Tr. 46). Plaintiff's employment history also included selling concessions and ushering at movie theaters, housekeeping at a Best Western, and fry cooking at Dairy Queen. (Tr. 47-50). When Plaintiff's attorney examined her about her work at Arby's, she confirmed that she worked the evening shift nine hours per week and stayed on the fryer because she failed the sandwich-making test. (Tr. 69-70).

In regard to her daily activities, Plaintiff testified that she generally awakens between 8:00 am and 9:00 am, drinks tea, and watches television. (Tr. 50-51). Plaintiff "sometimes" cleans dishes and vacuums, and she also cooks, does laundry, cleans the floors, and shops. (Tr. 51-52). Plaintiff stated: "I get along with a lot of people. I'm easy to get along with. . . . I'm a very social person." (Tr. 52). Plaintiff testified that she played softball in the Special Olympics

and, on weekends, "I just sit at home and relax because – because I've been in and out on the weekdays and I just need some time to relax." (Tr. 54). Plaintiff can lift "about 50 pounds" and has no problem bending, stooping, crouching, crawling, or climbing stairs. (Tr. 65-66).

Plaintiff testified that she was currently taking Amlodipine, vitamin D, Abilify, hydroxyzine chromiate, lamotrigine, and citalopram. (Tr. 57-59). Plaintiff also took Naproxen for pain in her arm, which she testified "[has] been hurting me for almost a whole year." (Tr. 58). Plaintiff stated that one of her medications made her "sleepy," but she experienced no other side effects. (Tr. 59).

Plaintiff advised the ALJ that she suffered ADHD, "explosive disorder," and bipolar disorder. (Tr. 60). In regard to her intermittent explosive disorder, Plaintiff explained: "I have a temper so bad that I just want to destroy something." (Tr. 60). Plaintiff described a recent incident in which she became angry at her boyfriend and "started doing things to myself. . . . I clawed myself really hard . . . ." (Tr. 61). Plaintiff testified, "I do hear voices in my head. . . . We have a – we have a conversation . . . . I tell them that I've got to use the bathroom and that don't follow me, you know." (Tr. 65). About one year earlier, Plaintiff attempted to commit suicide and spent ten days in the hospital. (Tr. 63). Plaintiff did not return to work after her hospitalization because "I couldn't take it because of the – of the write ups and I – I got a feeling that if even I went back there, they would probably let me go because of the write ups." (Tr. 75). Plaintiff had been seeing Dr. Gebara once a month for counseling, but Dr. Gebara recently informed Plaintiff that "they're switching doctors." (Tr. 63-64).

Finally, the ALJ examined Ms. Young, the vocational expert. (Tr. 77). The ALJ asked Ms. Young to consider a hypothetical individual with: a high school education; previous work as a warehouse worker, fry cook, cashier, and hotel housekeeper; ability to perform medium work,

including lifting 50 pounds occasionally and 25 pounds frequently; and a limitation "to simple repetitive tasks and instructions with only occasional decision making and not requiring pace or quota." (Tr. 78-79). Ms. Young stated that such restrictions would preclude employment as a cashier or fry cook, but this hypothetical individual could work as a housekeeper, dishwasher, or hand packer. (Tr. 79). Ms. Young affirmed that her testimony was consistent with the Dictionary of Occupational Titles and Selected Characteristics of Occupation. (Tr. 80).

Plaintiff's counsel asked Ms. Young to consider a hypothetical individual with Plaintiff's age, education, and work history "who is limited to simple, repetitive tasks and who even when performing simple and repetitive tasks would nevertheless make occasional errors requiring supervisory intervention an additional five times per work day for the purpose of task redirection or the repeating of instructions[.]" Ms. Young replied, "I expect they would not be able to retain that work with that level of supervisory – supervisory and for the redirection." (Tr. 81). Nor did she believe the hypothetical individual could retain his or her employment if, instead of the supervisory intervention, the individual "would be off task 20 percent of the work day outside of usual breaks with no abilities to speed up or recover resulting in a commensurate daily reduction of total productivity." (Id.). Ms. Young affirmed that an individual who requires the assistance of a job coach to remain on task and keep pace is "less than competitive." (Tr. 82).

### B.  Relevant educational and medical records

According to Plaintiff's public school records, she began receiving special education services in 1983. (Tr. 303-18). In November 1986, Plaintiff's third-grade teacher referred her for a psychological evaluation "due to the three year re-evaluation requirement for students in special education programs." (Tr. 346). An examiner from the school district's psychological services staff administered the Weschler Intelligence Scale for Children – Revised (WISC-R) IQ

test, and Plaintiff achieved a full-scale score of 87, which was within the "low average range." (Tr. 348). The examiner noted Plaintiff's "distractibility," "poor task persistence and low frustration tolerance," limited "concentration and self-control," "language processing problems," and "visual-perceptual impairment," and she recommended Plaintiff's continued participation in the school's "Emotionally Handicapped program." (Tr. 348-49).

Dr. Susan Smith, a child psychologist, completed a psychiatric assessment for Plaintiff in June 1987. (Tr. 351-57). Dr. Smith observed that Plaintiff suffered a "developmental delay since infancy," clumsiness, "easy distractibility," "short attention span," "impulsivity," "low frustration threshold," "oppositional behavior and explosive temper," and "low self-esteem." (Tr. 356). Dr. Smith diagnosed Plaintiff with ADHD, oppositional disorder, and a chronic motor tic disorder. (Tr. 357). Dr. Smith recommended Plaintiff receive individual psychotherapy and "trial of an antidepressant such as desipramine which has some efficacy in ADD . . . ." (Id.)

In February 1996, Plaintiff received another psychological evaluation in accordance with the requirements for students in special education programs. (Tr. 342-45). The psychological services staff administered a Kaufman Brief Intelligence Test (K-BIT), on which Plaintiff earned a full-scale score of 81, a level of functioning at which one "may be expected to learn at a slower rate, retain less knowledge, and require more time to complete tasks than the average student." (Tr. 343). The evaluating psychologist concluded that Plaintiff's "inappropriate behavior patterns interfere with interpersonal relationships and social/emotional development" and recommended Plaintiff's continued participation in the Emotional and Behavioral Disorders program. (Tr. 344-45).

In April 1996, Dr. Barbara Weissman performed a neurological evaluation on Plaintiff because "there was some concern about possible seizures per Dr. Pam Forbes . . . her treating

psychiatrist." (Tr. 368-71). Dr. Forbes had observed "when [Plaintiff] is talking, she will drift off and loose [sic] her train of thought. She all of [a] sudden will forget what she is saying and totally does not remember at that time." (Tr. 368). Dr. Barbara Weismann noted that Plaintiff was taking Zoloft and Buspar. (Tr. 369). Dr. Weismann "doubt[ed] that this young lady has seizures from the description of the spells. I think most likely she has very disorganized thoughts and tends to loose [sic] track of where she is." (Tr. 370).

In May 1996, Plaintiff's psychiatrist, Dr. Peggy Forbes completed a State Health Benefit Plan, Physical or Mental Disability Questionnaire for Plaintiff. (Tr. 333) Dr. Forbes listed the following diagnoses and limitations: impulsive control disorder, not otherwise specified; mental retardation, severity unspecified; violent outbursts and threats of violent behavior when frustrated; easily provoked; poor judgment; and social immaturity. (Id.). Dr. Forbes opined that Plaintiff "[c]ould be capable of very structured, probably part-time employment." (Id.).

In 1996, Plaintiff failed the Georgia High School Graduation Test. (Tr. 318). She graduated high school with a special education diploma and certificate of attendance. (Tr. 317).

In July 2002, Dr. Stephen Miller, a neuropsychologist, performed a neurological evaluation on Plaintiff. (Tr. 340-41). Dr. Miller diagnosed Plaintiff with "cognitive disorder not otherwise specified, likely congenitally-based" and borderline intellectual functioning. (Tr. 341). Dr. Miller summarized his findings as follows: "Overall, [Plaintiff] exhibited borderline performance on tasks of intellectual and memorial functioning. She demonstrated particular difficulty completing tasks that required cognitive flexibility, timely completion, immediate memory components, and visual-constructional ability. . . . and her overall general memorial performance was moderately impaired, as she demonstrated particular difficulty retaining information." (Id.). Dr. Miller opined that Plaintiff might be able "to maintain some kind of

employment," but found that Plaintiff's "emotional lability is likely to continue, and may prove challenging in work contexts." (Id.)

In July 2007, Dr. John Yunker performed a consultative psychological evaluation of Plaintiff. (Tr. 328-332). Dr. Yunker observed that Plaintiff was "[f]riendly and cooperative with borderline intellectual functioning." (Tr. 329). Plaintiff reported that she was currently taking Concerta and trazodone. (Id.). Dr. Yunker administered the Wechsler Adult Intelligence Scale – III IQ test, and Plaintiff received a full-scale score of 75, which he stated was in the "borderline range." (Id.). Dr. Yunker diagnosed Plaintiff with: organic mood disorder, nonspecified; intermittent explosive disorder; generalized anxiety disorder; borderline personality features; and borderline intellectual functioning. He assessed Plaintiff with the following limitations: mild restrictions of daily activities; mild to moderate difficulty in maintaining social functioning, understanding and remembering instructions, and adapting to her environment; moderate deficiency to concentration or persistence and ability to sustain concentration and persistence in task. (Tr. 332).

From July 2007 through December 2009, Plaintiff met with Lisa von Wahlde, MSW, LCSW at Lutheran Family and Children's Services approximately every other week "with the goals of anger management, mood modulation, and developing skills for obtaining and sustaining healthy interpersonal relationships." (Tr. 434). In a letter to the Disability Determinations Services dated March 5, 2012, Ms. von Wahlde reported that these difficulties, coupled with environmental stressors, "frequently impacted [Plaintiff's] ability to attend work regularly, significantly impacted her ability to meet work expectations consistently, and her ability to sustain steady employment." (Id.).

Ida Grider, MA provided Plaintiff fifteen counseling sessions between February 2012 and September 2012. (Tr. 580-95). Ms. Grider worked with Plaintiff on managing her anger and depression. (Tr. 584-85). During her third session, Plaintiff informed Ms. Grider: "Work is my main issue. I have high anxiety at work. I scream and shout at work. I feel angry and like I could explode. I let little things get to me." (Tr. 587). Plaintiff and Ms. Grider also discussed Plaintiff's conflicts with a roommate, as well as her boyfriend's sister, who had obtained a restraining order against Plaintiff. (Tr.593).

A handwritten and unsigned psychiatric evaluation from Jewish Family and Children's Services, dated April 9, 2012, stated that Plaintiff suffered ADHD, intermittent explosive disorder, and impulse control disorder. (Tr. 453-57). Plaintiff reported that she was "often unable to control her emotions and begins to throw and break things. She is at risk of losing her job at this point." (Id.). Plaintiff was taking Prozac. (Tr. 454). The evaluating psychiatrist noted that Plaintiff, who brought a stuffed animal to her appointment, spoke loudly and in a child-like tone and exhibited a tangential thought process, fair memory, very poor impulse control, poor judgment, and below average estimated intelligence. (Tr. 456). The psychiatrist directed Plaintiff to continue taking Prozac and prescribed Lamictal. (Tr. 457).

Plaintiff saw Dr. Bashyal at Jewish Family and Children's Services for a follow-up assessment on June 10, 2012. (Tr. 739). Dr. Bashyal noted that Plaintiff reported feeling "more irritable, more frustrated" and "she had some superficial cuts on her thigh also scratche[s] on her arm. Says that she did these in moments of frustration and after arguments with her boyfriend." (Id.) Dr. Bashyal discontinued Plaintiff's Prozac and prescribed Paxil and Lamictal. (Id.).

Dr. Marsha Toll, a state agency psychological consultant, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment for Plaintiff on April

30, 2012. (Tr. 459-66). Dr. Toll found that Plaintiff suffered organic mental disorders and anxiety-related disorders, as well as borderline intellectual functioning and ADHD. (Tr. 459). Dr. Toll noted the following functional limitations: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 467). Dr. Toll concluded: "The claimant would be capable of sustained work participating in one and two step instructions. She would be able to interact with others on a profession [sic] level but is not recommended for work with the general public to reduce work place stress." (Tr. 473).

Plaintiff's treating psychiatrist, Dr. Throop, completed a MMSS for Plaintiff on June 25, 2012. (Tr. 720-27). Dr. Throop stated that Plaintiff's impairments extremely limited her ability to cope with normal stress, function independently, behave in an emotionally stable manner, and maintain reliability. (Tr. 720). In regard to social functioning, Dr. Throop found that her impairments: extremely limited her ability to accept instructions or respond to criticism; markedly limited her ability to interact with strangers or the general public and to relate to family, peers, or caregivers; and moderately limited her ability to ask simple questions, request assistance, and maintain socially acceptable behavior. (Tr. 721). In the category entitled "concentration, persistence or pace," Dr. Throop determined that Plaintiff's impairments: extremely limited her ability to maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, and respond to changes in work setting; and markedly limited her ability to make simple and rational decisions and sustain an ordinary routine without special supervision. (Tr. 721). Dr. Throop wrote: "[Plaintiff] suffers from mental retardation (since birth) and has resultant psychiatric issues including intermittent explosive disorder, depressive d/o NOS, very poor concentration +

11

coping skills.  Her frustration and anger resulting from this interferes with her work and daily life significantly.  [Plaintiff] requires a lot of support."  (Tr. 723).

On June 29, 2011, Plaintiff's job counselor brought her to the emergency room at Mercy Hospital, where Plaintiff reported a recent suicide attempt, increased depression, and self-abuse. (Tr. 565-77, 650-52).  Dr. Malik Ahmed "admitted [Plaintiff] to the Inpatient Unit and put [her] on suicidal precautions."  (Tr. 566).  The hospital discharged Plaintiff on July 10, 2012, and Plaintiff received intensive outpatient treatment until July 27, 2012.  (Tr. 550-64, 572).

Dr. Gebara completed a psychiatric in-take assessment for Plaintiff at BJC Behavioral Health on October 30, 2012.  (Tr. 760-65).  Dr. Gebara found that Plaintiff "does not appear to have any symptoms consistent with bipolar disorder," but stated that Plaintiff "has a history of requiring special education classes, very low frustration tolerance, difficulty with calculations, and low emotional intelligence likely all consistent with a  diagnosis of mild mental retardation." (Tr. 764).  Dr. Gebara further found that Plaintiff's "history is also consistent with borderline personality disorder as she has chronic fears of abandonment and feelings of emptiness, intense and unstable relationships, difficulty controlling her anger and affective instability, poor self[-]image, history of cutting and self-injurious behavior, parasuicidal gestures, and an unstable sense of self."  (Id.).  Dr. Gebara directed Plaintiff to continue her current medication regimen of Abilify, Lamictal, and hydroxyzine.  (Id.).  Dr. Gebara provided Plaintiff psychotherapy on a monthly basis from October 2012 through April 2013.  (Tr. 766-89).

On January 28, 2013, Plaintiff sought treatment at North Central Community Health Center for pain in her left arm and received a prescription for pain medication.  (Tr. 821). Approximately one month later, on February 26, 2013, Plaintiff reported to Grace Hill Health Center complaining of joint pain in her left shoulder, which she reported experiencing for two

months.  (Tr. 751-52).  Dr. Lubbna Johar ordered an MRI and directed her to continue taking Naproxen.  (Tr. 752).   Plaintiff returned to Grace Hill Health Center on March 27, 2013 complaining of continued shoulder pain.  An x-ray taken at the previous visit was normal, but Plaintiff did not obtain an MRI because "it was declined."  (Tr. 757-59).

Dr. Gebara, Plaintiff's treating psychiatrist, completed a MMSS for Plaintiff on March 26, 2013.  (Tr. 728-31).  Dr. Gebara found that Plaintiff was: extremely limited in her ability to cope with normal stress, function independently, and behave in an emotionally stable manner; and markedly limited in her ability to maintain reliability and adhere to basic standards of neatness and cleanliness.  (Tr. 728).  In regard to social functioning, Dr. Gebara found that Plaintiff was:  extremely limited in her ability to accept instructions or respond to criticism; markedly limited in her ability to interact with strangers or the general public; and moderately limited in the remaining three areas.  (Tr. 729).  In the category of concentration, persistence, or pace, Dr. Gebara noted that Plaintiff was:  extremely limited in her ability to maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, and respond to changes in work setting; markedly limited in her ability to sustain an ordinary routine without special supervision; and moderately limited in her ability to make simple and rational decisions.  (Id.).

In regard to work performance, Dr. Gebara believed Plaintiff could not apply commonsense understanding to carry out one- or two-step instructions or interact appropriately with coworkers, supervisors, or the general public for more than two hours per day.  (Tr. 730).  Dr. Gebara also estimated that Plaintiff's psychologically-based symptoms would cause Plaintiff to be late to work or need to leave work early twice a month.  (Tr. 731).  Dr. Gebara wrote:

> [Plaintiff] has been diagnosed with mental retardation in addition to co-morbid major depressive disorder and intermittent explosive disorder and ADHD.  As

a result, she has very poor coping skills, poor concentration resulting in anger outbursts and very low frustration tolerance that interferes with her work and daily life. She requires a lot of support with her poor prognosis and very limited capacity to function.

(Tr. 731).

### C. Vocational rehabilitation records

In May 2007, Judy Seltzer, a vocational rehabilitation counselor, completed a "Missouri CRP/SESP Referral Form" and Eligibility Certification for Plaintiff. (Tr. 338-39). Ms. Seltzer stated that Plaintiff had ADHD and borderline intellectual functioning with maladaptive behaviors, which "constitutes or results in a substantial impediment to employment." (Tr. 339). Ms. Seltzer noted that Plaintiff "[m]ust avoid employment which is likely to aggravate disability" and her "[d]isability interferes with preparation for an occupation commensurate with capacities and abilities," but she found that Plaintiff "can benefit in terms of an employment outcome from the provision of vocational rehabilitation . . . ." (Id.).

On June 24, 2010, Cody Thomas, a vocational rehabilitation counselor, completed an Eligibility Certification for Plaintiff, finding that Plaintiff suffered cognitive impairments due to ADHD and borderline intellectual functioning with maladaptive behaviors. (Tr. 705-06). Mr. Thomas described Plaintiff limitations as follows:

> [Plaintiff] requires greater simplification and repetition to learn than do most others. She is impeded in the capacity to focus and concentrate and to remain on task. She has difficulty maintaining the same work pace as most others. She has poor social boundaries and interpersonal skills. She is impeded in the ability to solve problems and in the ability to tolerate frustration. She is impeded in the ability to plan and anticipate consequences.

(Tr. 705). Mr. Thomas concluded that Plaintiff required vocational rehabilitation service "to prepare for, engage in or retain gainful employment." (Id.). In an accompanying document completed the same day, entitled "Significantly Disabled Classification," Mr. Thomas classified

Plaintiff as suffering a "Most Significant Disability (Priority Category I)." (Tr. 707-10).

In a letter to Disability Determinations Services dated February 7, 2012, Mary Davies from A.O., Inc. Employment Services wrote that Plaintiff "has been receiving Employment Services since July 2007." (Tr. 411). Ms. Davies explained: "[Plaintiff] was initially referred for a Vocational Assessment by Division of Vocational Rehabilitation and was placed in employment in October 2009. She has been receiving Follow Along services since this time." (Id.). In a follow-up letter dated May 7, 2012, Ms. Davies provided the following information:

> [Plaintiff] has received 48 hours of follow along services thus far this fiscal year (from July 1, 2011 through March 31, 2012) for an average of 6 hours of support per month. A summary of information provided in the case notes indicate support provided to [Plaintiff] as she has experienced several written warnings at work. She finally requested that her schedule be reduced to help alleviate the stress that this was causing her. Retention Specialist has visited with [Plaintiff] both at work and in her home and has encouraged her to see her doctor for her stress. She has also encouraged [Plaintiff] to reapply at Vocational Rehabilitation to return to job development.

(Tr. 490).

On April 3, 2012, Megan Piel, a vocational rehabilitation counselor at Missouri Office of Adult Learning and Rehabilitation Services, completed an Eligibility Determination finding that Plaintiff was "Most Significantly Disabled." (Tr. 596-98). In support of her eligbility determination, Ms. Piel wrote:

> Client has impairments in learning, thinking, processing information, and concentration. She has low frustration tolerance and often becomes angry when frustrated when she does not understand something or when something does not go her way. Client does not manage stress well in a work setting requiring her to work in a low stress environment. Client needs to work in a setting where she has routine and structure with her work tasks. Client should not work in a setting where she is around a lot of people due to her difficulty with interpersonal skills and her easily being distracted by other people around her. In order to gain and maintain successful employment, client will need assistance from VR.

(Tr. 597).

### III. *Standards for Determining Disability Under the Act*

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### IV. *The ALJ's Determination*

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920, and he found that Plaintiff: had not engaged in substantial gainful activity for a continuous twelve-month period; had the severe impairments of "[t]he residual effects of a left shoulder injury, bipolar disorder, depression, and borderline intellectual functioning"; and does not have an impairment or combination of impairments that meets or medically equals the

severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (the "paragraph B criteria"). (Tr. 14-15).

In regard to mental impairments, the ALJ found that Plaintiff had: mild restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulties with concentration, persistence, or pace; and no episodes of decompensation. (Tr. 16). The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work "except she is limited to jobs that involve simple, repetitive tasks and instructions with only occasional decision[-]making, and not requiring pace or quota." (Tr. 17).

The ALJ summarized evidence of Plaintiff's employment history at FedEx, Arby's, and Winn Dixie, and stated that Plaintiff "has been successful making and keeping friends." (Tr. 18). The ALJ noted that Plaintiff "was admitted to Mercy [H]ospital on August 8, 2012 with 'jittery motor skills hyperagitated,'" and that her "symptoms have been mild to moderate since then." (Tr. 18). The ALJ believed that Plaintiff's testimony that "her symptoms are well controlled with medications suggests that she is capable of engaging in work activities." (Id.)

The ALJ proceeded to review Plaintiff's medical records and stated: "The claimant's allegations of total disability are inconsistent with the mild to moderate symptoms she is observed to have by her doctors, and inconsistent with her history of working while experiencing symptoms related to her impairments." (Tr. 18). Without referring by name to Drs. Throop and Gebara, the ALJ stated: "Two of the claimant's treating doctors[,] have submitted reports indicating that the claimant is extremely limited in her ability to function." (Id.). The ALJ found that those reports "cannot be given significant weight" because they "are not consistent with observations of the claimant's treating and examining doctors, and are not consistent with the claimant's typical activities of daily living." (Id.). The ALJ also declined to "give[] significant

weight" to Dr. Forbes' May 1996 report and Dr. Yunker's July 2007 report because they were "too far removed in time[.]" (Tr. 18-19). The ALJ observed, however, that Dr. Yunker's report "serve[d] to illustrate the claimant's history of being able to work even though she experienced some symptoms due to her mental disorders[.]"

The ALJ found that 2012 report by Dr. Toll, the psychological consultant, "deserve[d] some weight." (Tr. 19). The ALJ wrote: "Dr. Toll found the claimant to have moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace, but also found that she retains the ability to engage in full-time work." (Tr. 19). The ALJ stated that Dr. Toll's opinion "is well-reasoned and is generally consistent with the claimant['s] activities . . . ." (Tr. 19).

The ALJ also gave "some weight" to Dr. Auvenshine's testimony that "claimant has moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace, but . . . retains the ability to engage in full-time work." (Tr. 19). The ALJ acknowledged that, "[o]n cross[-]examination [Dr. Auvenshine] changed his position on some issues," but found that Dr. Auvenshine's equivocation "did not alter the conclusion that the claimant retains the ability to work as described in the RFC above." (Id.).

Despite finding that Dr. Toll's and Dr. Auvenshine's assessments deserved "some weight," the ALJ determined that Plaintiff's "social limitations are mild and not moderate, as identified by Dr. Toll and Dr. Auvenshine" (Id.). In support of his finding, the ALJ cited Plaintiff's testimony about "her history of successful interpersonal relationships at work and at home[.]" (Id.). The ALJ further reasoned: "Although she has a history of angry outbursts from time to time, these incidents appear to be relatively uncommon, well[-]controlled by her medication, and do not seem to negatively [a]ffect her ability to engage in work." (Id.).

In regard to Plaintiff's physical impairment, the ALJ noted that Plaintiff "was cleared to participate in the Special Olympics" in October 2012 and the "objective medical evidence suggests that she does not have any chronic physical impairment that would limit her ability to work." (Id.). However, the ALJ gave Plaintiff "the benefit of the doubt by finding the residual effect of her left shoulder injury a severe impairment that limits her to medium work." (Id.).

Finally, the ALJ determined that Plaintiff was unable to perform her past relevant work as a FedEx package handler because "[i]t required her to work at a fast pace" and Plaintiff "is limited to jobs that do not require her to work at a fast pace." (Tr. 19). However, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform," including work as a housekeeper, dishwasher, or handpacker-packager. (Tr. 20). Thus, the ALJ concluded that Plaintiff had not been under a disability from October 1, 2011 through the date of the decision. (Id.).

## V.    Standard for Judicial Review

The court must affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after

reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairments. Stewart v. Sec. of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

## VI.     Discussion

Plaintiff claims the ALJ erred in: (1) failing to address the alleged conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles or the Selected Characteristics of Occupations; (2) formulating an RFC that is incomplete, inconsistent with the ALJ's other findings, and "too vague to allow for meaningful vocational expert consideration or review by this Court"; and (3) failing to accord proper weight to medical opinion evidence. In response, Defendant contends that no conflicts existed between the vocational expert's testimony and the DOT, and she asserts that the ALJ properly weighed the medical evidence and formulated a RFC. Because this court finds the ALJ erred in disregarding the opinions of Plaintiff's treating psychiatrists, the court will only address this issue.

Plaintiff claims the ALJ "failed to analyze medical opinion evidence in the manner required by regulation and Eighth Circuit law." (Doc. 15). More specifically, she contends that the ALJ erred in: (1) discounting the medical source opinions of her treating psychiatrists, Drs. Throop and Gebara; and (2) granting undue weight to the opinion testimony of a non-examining physician, Dr. Auvenshine. Defendant counters that the ALJ properly weighed the medical opinion evidence and discounted the opinions of Drs. Throop and Gebara because they were "inconsistent with the physicians' own treatment notes and other medical evidence of record." [Doc. 22].

"The opinion of a treating physician is accorded special deference under the social security regulations." Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Indeed, when the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give the opinion "controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015). "'Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.'" Papesh, 786 F.3d at 1132 (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)). An ALJ "may discount or even disregard the opinion ... where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (quoting Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015)).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, he or she must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence

provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c) 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Anderson v. Barnhart, 312 F.Supp.2d 1187, 1194 (E.D. Mo. 2004). See also Tilley v Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

Dr. Gebara was treating Plaintiff when she completed the MMSS on March 26, 2013. (Tr. 728, 760-85). In the MMSS, Dr. Gebara noted that Plaintiff had either extreme or marked limitations in all five areas of daily living. (Tr. 728). Dr. Gebara found that Plaintiff was extremely limited in three of the five areas of concentration persistence, or pace, and she was either markedly or moderately limited in the remaining two. (Tr. 729). In regard to social functioning, Dr. Gebara stated that Plaintiff was: extremely limited in her ability to accept instructions or respond to criticism; markedly limited in her ability to interact with strangers or the general public; and moderately limited in her ability to relate to others, ask simple questions, request assistance, and maintain socially acceptable behavior. (Id.). Dr. Gebara found that Plaintiff was incapable of carrying out simple one- or two-step instructions or interacting appropriately with coworkers, supervisors, or the general publication for more than two hours per day. (Tr. 730).

Dr. Throop, who treated Plaintiff prior to Dr. Gebara, completed an MMSS for Plaintiff on June 25, 2012. (Tr. 720-23). Dr. Throop found Plaintiff extremely limited in four out of five

areas of daily living.  (Tr. 724).  In the areas of social functioning, Dr. Throop found Plaintiff: extremely limited in her ability to accept instructions or respond to criticism; markedly limited in her ability to relate to others and interact with strangers or the general public; and moderately limited in the two remaining areas.  (Tr. 725).  Dr. Throop determined that Plaintiff was extremely limited in three areas of concentration, persistence, or pace and markedly limited in the remaining two areas.  (Tr. 725).  Like Dr. Gebara, Dr. Throop reported that Plaintiff could sustain no more than two hours per day applying commonsense understanding to carrying out simple instructions and interacting appropriately with coworkers, supervisors, and the general public.  (Tr. 726).

The ALJ's limited discussion of Dr. Throop's and Dr. Gebara's opinions did not identify the doctors and consisted of the following three sentences:

> Two of the claimant's treating doctors have submitted reports indicating that the claimant is extremely limited in her ability to function.  (Ex. B26F, B27F, B24F, B25F).  These assessments are not consistent with observations of the claimant's treating and examining doctors, and are not consistent with the claimant's typical activities of daily living.  For these reasons these two reports cannot be given significant weight.

(Tr. 18).  Significantly, the ALJ considered only one factor set forth in 20 C.F.R. § 416.927(c)(2) – namely, "consistency of the opinion with the record as a whole" – and failed to identify the purported inconsistencies.  Based on a review of the record and the ALJ's decision, the court concludes that the ALJ neither applied the factors set forth in 20 C.F.R. § 416.927(c)(2) nor provided sufficient reasons for giving little, if any, weight to Dr. Throop's and Dr. Gebara's opinions.

Furthermore, contrary to the ALJ's finding, the MMSS's completed by Drs. Throop and Gebara are consistent with Dr. Gebara's treatment notes[2] and the observations of Plaintiff's treating and examining doctors. Dr. Gebara provided Plaintiff counseling on a monthly basis from October 2012 until the time of the ALJ hearing in May 2013. (Tr. 63-64, 760-85). In her initial psychiatric assessment, Dr. Gebara found that Plaintiff had a "history of oppositional defiant disorder, intermittent explosive disorder, and mood disorder, NOS . . . . Patient has a history of requiring special education classes, very low frustration tolerance, difficulty with calculations, and low emotional intelligence likely all consistent with a diagnosis of mild mental retardation." (Tr. 764). Dr. Gebara declined to confirm the diagnosis of ADHD, but noted that Plaintiff's history was "consistent with borderline personality disorder as she has chronic fears of abandonment and feelings of emptiness, intense and unstable relationships, difficulty controlling her anger and affective instability, poor self[-]image, history of cutting and self-injurious behavior, parasuicidal gestures, and an unstable sense of self." (Tr. 764). Although Dr. Gebara's later treatment notes reflect improvement in Plaintiff's mood, nothing in her notes suggests an ability to maintain employment. (Tr.760-85).

Dr. Gebara's and Dr. Throop's opinions were also consistent with the observations of Plaintiff's other treating and examining doctors. In 1987, Dr. Susan Smith assessed Plaintiff, then ten years of age, and diagnosed her with a developmental delay, ADHD, oppositional disorder, and a chronic motor tic disorder. (Tr. 351-57). In 1996, Plaintiff's treating psychiatrist, Dr. Forbes, diagnosed Plaintiff, then nineteen years of age, with: impulsive control disorder not otherwise specified; mental retardation, severity unspecified; violent outbursts and threats of violent behavior when frustrated; poor judgment; and social immaturity. (Tr. 333). In

---

[2] The record appears not to contain Dr. Throop's treatment notes. Defendant does not dispute that Dr. Throop was Plaintiff's treating physician.

2002, Dr. Miller, a neuropsychologist, diagnosed Plaintiff with a cognitive disorder and borderline intellectual functioning. (Tr. 340-41). In 2007, Dr. Yunker, a psychological consultant, diagnosed Plaintiff with borderline intellectual functioning, organic mood disorder, intermittent explosive disorder, generalized anxiety disorder, and borderline personality features. (Tr. 329). In 2012, a psychiatrist at Jewish Family and Children's Services stated that Plaintiff suffered ADHD, intermittent explosive disorder, and impulse control disorder. In short, every mental health provider who examined or treated Plaintiff from 1987 through her hearing in 2013 noted Plaintiff's limited mental and emotional capabilities.

Additionally, the court notes that the opinions of Drs. Throop and Gebara were consistent with the observations of Plaintiff's vocational rehabilitation counselors. The record reveals that Plaintiff began receiving vocational rehabilitation services in 2007 after vocational counselor Judy Seltzer determined that Plaintiff suffered ADHD and borderline intellectual functioning with maladaptive behaviors. (Tr. 338-39). In 2010 and 2012, counselors at the Missouri Office of Adult Learning and Rehabilitation Services completed eligibility determinations for Plaintiff classifying her as "Most Significantly Disabled (Priority Category 1)." (Tr. 596-98, 705-10). In Plaintiff's most recent eligibility determination, vocational counselor Megan Piel described Plaintiff's functional limitations as follows:

> Client has difficulty with concentration and focus to remain on ask. She has trouble maintaining a similar work pace as others around her in a work setting. Client has poor social boundaries and interpersonal skills. She lacks tact and has difficulty following and responding in conversation with others. She has a low frustration tolerance and often becomes very angry when frustrated. Client feels stressed easily in a work setting and has a hard time managing her stress. Client often has anxiety attacks when she feels overwhelmed. She has difficulty multi-tasking, problem solving, and using proper judgment and decision making. . . .

(Tr. 597).  Although the vocational rehabilitation counselors were not "acceptable medical sources" for purposes of 20 C.F.R. § 416.913(a), the ALJ failed to recognize their opinions as "other medical sources" under 20 C.F.R. § 416.913(d)(3).  See Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003).

In his decision, the ALJ assigned the most weight to the opinions of two non-treating, non-examining doctors, Drs. Toll and Auvenshine.  "[T]he opinions of nonexamining sources are generally . . . given less weight than those of examining sources."  Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (quoting Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008)).  "These assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician."  Singh, 222 F.3d at 452 (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)).  However, a court may credit a non-examining source's medical opinion over that of a treating physician when such other assessments "are supported by better or more thorough medical evidence."  Prosch, 201 F.3d at 1014 (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Dr. Toll reviewed Plaintiff's file and found Plaintiff "to have moderate limitations in social functioning and moderate limitations in concentration, persistence and pace, but also found that she retains the ability to engage in full-time work."  (Tr. 19).  Dr. Auvenshine similarly based his assessment upon Plaintiff's file and determined that Plaintiff was moderately limited in social functioning and concentration.  (Tr. 19).  However, by his own admission, Dr. Auvenshine failed to consider Dr. Gebara's MMSS, treatment notes from Jewish Family and Child Services, and the vocational support Plaintiff received.  (Tr. 36, 40).  Additionally, as the ALJ noted in his decision, Dr. Auvenshine "changed his position on some issues" during cross-examination.  (Tr. 19, 36).  Neither Dr. Toll's nor Dr. Auvenshine's opinion was supported by

better or more thorough evidence than the opinions of Dr. Throop and Dr. Gebara. Nevertheless, the ALJ found that the non-examining doctors' opinions "deserved some weight" and gave little or no weight to the treating physicians' opinions.

Defendant argues that the ALJ properly discounted the treating physicians' medical opinions because the extreme limitations identified in their reports were not consistent with Plaintiff's past employment and activities of daily living. However, the court finds that the ALJ overstated Plaintiff's employment history and the significance of her activities of daily living. Although the ALJ noted that Plaintiff "obtained vocational assistance from a job coach," he overlooked the nature and extent of that assistance. (Id.). Plaintiff worked only ten to twelve hours per week, and she did so under "special work conditions" in that she received "extra supervision, or a job coach. Approx. once a week for entire shift." (Tr. 248, 269-76, 490). Despite this vocational assistance, the record reflects that Plaintiff received at least eleven disciplinary write-ups. (Tr. 417-20). Furthermore, on Plaintiff's last day of employment, her job counselor brought her to the emergency room because "she was having thoughts of hurting herself." (Tr. 46, 650-52).

The court finds no inconsistency between Plaintiff's claim of disability and either her employment history or activities of daily living (namely, riding a bicycle, using public transportation, performing household chores, and caring for her personal hygiene). See Reed, 399 F.3d at 923 ("[I]t is well-settled law that a claimant need not prove she is bedridden or completely helpless to be found disabled."). Plaintiff's fraught employment history and activities of daily living do not constitute substantial evidence that she is able to engage in substantial gainful activity.

## VII.    Conclusion

27

Given that the totality of the record supports the treating physicians' opinions regarding Plaintiff's limitations, the Court finds that the ALJ erred in affording those opinions little weight. For the reasons set forth above, the court finds that the Commissioner's decision was not supported by substantial evidence. The Commissioner's decision is reversed and remanded for the ALJ to properly evaluate the medical opinion evidence, reassess Plaintiff's RFC based on the medical evidence in the record, and continue with the next steps of the sequential evaluation process. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.


_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE


Dated this 20th day of April, 2016